### DAVISON–PICK FERTILIZERS, Inc., v. RICHARDSON.

### No. 1042.

Court of Appeal of Louisiana. First Circuit.
Oct. 5, 1932.

Benj. W. Miller, of Bogalusa, and Spearing & McClendon, of New Orleans, for appellant.

Ott & Johnson and Carter & Carter, all of Franklinton, for appellee.

MOUTON, J.

The following opinion was rendered by the district judge:

"The plaintiff sues to recover $1,544.25 on a note executed by defendant in favor of plaintiff given for credit shipments of fertilizer made by plaintiff to defendant. The defendant by way of re-convention and off-set claims that said note is paid and compensated by reason of a commission due him by the plaintiff company in accordance with an agreement by which he was to receive 10% commission on all sales of fertilizers made by him for the company and as their distributor or agent. Defendant further claims by way of re-convention freight on the various cars of fertilizer shipped him aggregating $998.35, making his total re-conventional demand $1,008.39.

"The principal question to be decided in this case is whether or not defendant was to receive a commission of ten per cent on the fertilizers which he sold from the company shipments to him. This question resolves itself largely into whether the court is to accept the testimony of defendant or that of one, Morrice, representative of plaintiff who negotiated the original arrangements by which defendant handled fertilizers for plaintiff. Defendant states positively that he was to receive ten per cent of the money which he would be required to put out in handling the fertilizers, and he in turn sold, with the knowledge and consent of Morrice, the fertilizer to the local customers for the same price which it cost him. In other words if the defendant was not to get ten per cent commission, the only profit that he could have hoped to derive from the connection would be the accommodation of his gin customers who raised cotton in the vicinity and patronized his gin. In fact, he would not only have received no profit for his time, incidental expense in handling the fertilizer, but would have taken the chance of collecting for the fertilizer sold to the various customers, as defendant had to pay cash for the fertilizer which he received.

"For a business man to make such a trade would seem to be very anomalous. The defendant's position is further substantiated by the admitted fact that the representative of plaintiff company visited the defendant every few days and went with him to see the farmers and helped advertise and sell the fertilizer to the local trade. There was a keen competition among the fertilizer dealers and some price cutting, indicating that there must have been a strong incentive on the part of the plaintiff to make a connection with defendant to handle the fertilizer for them in that territory. It is true that defendant was allowed the usual discount of 10% on the invoices for cash, but that seems to have been a regular discount to all customers paying cash. The main incentive for defendant to handle the fertilizers was the fact that he was to get the ten per cent commission on the amount of money which

he would be required to put out in order to procure the fertilizer, which would in turn put him in close touch with his gin customers, and at the same time allow him something for his time, expense, and risks incurred in re-selling to the farmers.

"The testimony of Mr. Richardson, the defendant, is very positive and consistent, and his good faith and honesty in the matter is without question. He is a man of unimpeachable character and honesty, and the court is fully convinced that his version of the transaction is correct. On the contrary, the representative of plaintiff impresses the court as now making an effort to extricate himself from a situation which he entered into with a desire to secure business over his competitors and which probably was not fully revealed to his company.

"Morrice was clothed by the plaintiff company with apparent authority to sell fertilizer which implied the making of terms for sales. Moreover, it appears from the evidence that he talked with plaintiff's office by telephone during the negotiations. If Morrice was restricted by any secret limitations on his authority, it would not bind the defendant who acted with him in good faith. Johnson v. Manget Bros. Co., 168 La. 317, 122 So. 51.

"It is not certain whether defendant sold the fertilizer for the cost exclusive of freight, or whether he sold it for the actual cost to him including freight. In any event the claim for reimbursement for freight is apparently abandoned by defendant by a statement filed in the record since the trial by his attorneys in which the freight item is eliminated.

"Therefore, the proper way to arrive at an adjustment between the parties is by taking the total sales and crediting the defendant with his commission thereon and adding this credit to the other payments made by him. This will bring us to the following method of adjustment:

"Taking the compilation of total sales as shown on plaintiff's exhibit 16 as correct (and it is not questioned) we have:

Total sales paid by sight draft..$10,279.90
Total sales made on credit...... 3.356.63

Total net sales to defendant....$13,636.53
    Credits:
Paid by S. D. as shown
  above: .............$10,279.90
Four cash payments of
  $500.00 each from
  10/26/30 to 5/13/31.. 2,000.00
10% commission of to-
  tal net sales shown
  above ............. 1,363.65

Total payments and credits...$13,643.55
Leaving over-payment of $7.02.

"Therefore, the suit of the plaintiff should be dismissed, and defendant should have judgment in reconvention against the plaintiff for the amount stated above. Plaintiff to pay the cost."

In the foregoing opinion of the court, we find a correct statement of the issues, and of the principal facts to be considered for a proper solution of the contest between the parties to this suit.

The main question to be decided, as the court said, is as to whether defendant was to receive a commission of 10 per cent. on the fertilizers which he sold from the company's shipments to him.

It is shown that the sale of these fertilizers by defendant amounted to a total of $14,907.62, for which he had to pay cash. According to Morrice, representative of plaintiff, with whom defendant entered into the original arrangements for the handling of the fertilizers, he was not to receive any commission on these sales. As was said by the court, "For a business man to make such a trade would seem to be very anomalous." It is evident that defendant in making these sales had to take the risks of not being paid by some of the various customers with whom he might deal. It is indeed hard to believe that he would have entered into such an undertaking without the promise of some remuneration by plaintiff company which had a keen interest in selling these fertilizers.

The only incentive defendant could have had in entering into such an agreement was possibly the hope of the profit he might derive from the accommodation he might have given to the cotton growers who patronized his gin. What would have been the value of such increased patronage, if defendant would have obtained it, does not appear, and no attempt was made to show it.

Defendant denies that he told Morrice he wanted to handle the fertilizers without profit, that he might increase his business at the gin. On this subject he testifies that during ginning time he ran day and night, and had all the cotton he could take care of, and there is no evidence indicating that this statement is not true. There is no evidence to indicate that defendant would have made such a one-sided arrangement for the benefit of plaintiff company which, undoubtedly, was making a profit on the sales of the products it was handling in its business.

Leonard, testifying for plaintiff company, says that Morrice, its salesman, had no authority to allow a 10 per cent. commission on these sales. This may be true, but we think, as the district judge believed, that he got himself in that situation in his desire to secure business over his competitors and which probably he failed to fully reveal to his company.

Aside of the improbabilities that defendant would have entered into such an unprofitable and risky arrangement, let us now consider the testimony of Morrice and of defendant on this vital question of the 10 per cent. commission upon which plaintiff opened the door for the reception of the evidence by its examination of defendant on that subject.

Defendant testifies positively over and over again that he was to get 10 per cent. commission on the amount of fertilizers he sold, and makes it very clear that this was not to be considered as a discount.

He says the agreement was made at his plant or cotton gin in a freight car where he was engaged in unloading cotton seed meal with a colored boy by the name of William Brock.

C. L. Richardson, brother of defendant, testifies in the case.

His testimony is that he met Morrice, who had been bird hunting, and the same day, about 7:30 at night, saw him a second time in the Ideal Drug Store, and had a conversation with Morrice in reference to the selling of the fertilizers. He says it was discussed about defendant selling the fertilizers, and that Morrice said he "would give defendant ten per cent commission to handle the fertilizers." He also said that he told Morrice he would not handle it for him, but that his brother could, if he wanted to do so.

This testimony of C. L. Richardson is straightforward, and refers directly to a statement made to this witness by Morrice, that he was giving a commission of 10 per cent. to defendant to handle the fertilizers, and, beyond question, is a corroboration of defendant's testimony on the essential issue between these litigants.

In testifying that Brock, the colored boy, was in the freight car when he had the conference with Morrice about the arrangement for his 10 per cent. commission, defendant said that Brock must have heard what was said at the time.

After recognizing in the courtroom Mr. Morrice as being the man who came to the box car on the occasion in question, Brock says he could not say "exactly" what they had talked about, but says, "I heard him (meaning Morrice) ask Mr. Richardson about handling fertilizer for him." That statement by Brock again corroborates the evidence of defendant that a conference had been held between him and Morrice about the handling of the fertilizers.

Counsel for plaintiff say that, in testifying about what had occurred at this conference in the box car, defendant said he was unloading the cotton seed with Brock, while it was shown by that witness that defendant was merely supervising the work which was being done by Brock and another colored boy.

As to these immaterial circumstances as to whether defendant was actually engaged in unloading the car or in simply supervising the work, there is some discrepancy between the testimony of Brock and of defendant, but as to the main issue in this litigation the evidence of Brock is that Morrice was asking defendant to handle the fertilizers, and, in that respect, corroborates the defendant.

On the other hand, we will now direct our attention to what Morrice had to say on this vital issue. He denies that there ever was any promise on his part to pay this 10 per cent. commission, in fact, says it was never mentioned. Such is the trend of his testimony until he is questioned as to what occurred in the Ideal Drug Store where he met C. L. Richardson, defendant's brother.

He is then asked the following direct question: "Q. Did you tell his brother that you were giving Walton J. Richardson ten per cent commission? A. No, I didn't want to make him feel bad, he tried to get it for five per cent, and they refused him for it wouldn't have been any use to discuss it with him."

This answer certainly contains no denial that he told C. L. Richardson he had agreed to give defendant 10 per cent. commission. What does Morrice mean in saying that C. L. Richardson tried to "get it for five per cent.," if it was not in reference to the 10 per cent. commission about which he was questioned. If it had not been in reference thereto, why should C. L. Richardson have had any occasion to "feel bad." Obviously, this "bad" feeling could only have been the result of the failure of C. L. Richardson to obtain 10 per cent. commission which was given defendant, instead of the 5 per cent. which had been "refused" to him.

Defendant was cross-examined quite at length in reference to an undated letter written by him to plaintiff's attorneys. In that letter written in long hand, defendant says, in substance, that he will pay plaintiff company if he is paid his commission for "handling the fertilizer," and that he has sufficient proof that the commission is due him. He at first stated in his evidence that he had claimed 10 per cent. commission in that letter, then said he thought he had, and finally admitted he did not remember, or that he had only claimed a commission without stating it was 10 per cent.

An answer of plaintiff's attorneys by letter to this undated letter is dated January 13, 1931.

Defendant was being questioned about this undated letter during the trial in January, 1932, evidently a year after it was written, and of which defendant had not kept a copy.

Hence there is nothing astonishing in the fact that he could not remember if he had specified therein that his commission was to be 10 per cent.

In their answer to that letter, counsel for plaintiff say: "For your information, you have already been credited with commission of Two hundred and fifty-eight and 40/100 ($258.40) dollars in credit memorandum issued to you December 1, 1930."

In his report of January, 1930, which Morrice made to his company about the arrangements he claims he made with defendant, he has this to say: "He will give us his business for an additional 50c a ton flat, settlement to be made at the end of the season." Further, he explains in his report that the "50c will pay for his unloading."

The unloading of the fertilizers was certainly for the benefit of the plaintiff company, and it seems somewhat singular that the 50 cents a ton expended for that purpose should be referred to as a commission that defendant was to receive. It is evident that, in paying for this unloading, defendant did not receive anything, and to classify that expense as a commission is rather difficult to understand. Defendant in his evidence seems to refer to the $258.40 as part of his 10 per cent. commission. However that may be, the letter of defendant shows that he was claiming a commission, although he does not say that it is a 10 per cent. commission. His testimony in reference thereto, corroborated as it is by the other evidence to which we have heretofore referred, shows that it was fixed at 10 per cent. on the amount of fertilizers he would handle for plaintiff company.

Defendant says Morrice had promised him to send him his 10 per cent. commission by check "all in one." He testified that he had previously sold cotton-seed meal for another company on commission which he would get only at the end of the season. No doubt defendant was very loose in his business affairs, which is indicated by the fact that, in the letter he wrote claiming a commission, he failed even to date the letter and to mention that he was entitled to 10 per cent. commission.

The proof shows that, when Leonard, president of plaintiff company, called on defendant to pay the note sued upon, and with a view of obtaining a check for its payment delivered it to him, defendant took it and tore it up. This action by defendant was violent, unjustifiable, and reprehensible. There was nothing on the note to indicate that the commission defendant is claiming was less than 10 per cent. If there had been any notation thereon indicating anything of that character, from defendant's action in destroying it the inference could be drawn that he intended to do away with evidence that showed he was not entitled to the percentage he is claiming—but the note bore no evidence that could have justified such a deduction. The fact that he tore the note up, though very reprehensible, could not have the effect of destroying the fact that defendant under his agreement with Morrice was entitled to his 10 per cent. commission. The conduct of defendant is certainly not approved by this court, and, however much we condemn it, we cannot deny the rights that have accrued to him under his contract and which we are bound to recognize.

Counsel for plaintiff refer to Gray v. Feazel, 3 La. App. 142, in which the court says: "Where plaintiff who is suing under a verbal contract involving more than $500.00 has no other testimony besides his own and no corroborating circumstances * * * he will not be given judgment."

The rule above quoted says, where plaintiff "has no other testimony besides his own, and no corroborating circumstances, he will not be given judgment." Here, he has, besides his own evidence, the testimony of his brother, C. L. Richardson, to the effect that Morrice told him he was giving defendant 10 per cent. commission, and this Morrice never denied. On the contrary, for the reasons we have hereinabove given, his answer to the question propounded to him had the effect of confirming the evidence of C. L. Richardson on that subject.

The testimony of defendant is therefore corroborated by that of C. L. Richardson and also indirectly by that of Brock on the vital issue in this case.

Defendant having sustained his demand by corroborative proof, he is entitled to his 10 per cent. commission, as decreed below, and to the affirmance of the judgment.

Affirmed.